UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRETT HERRINGTON,

    *Plaintiff*

v.

UNITED STATES DEPARTMENT OF
DEFENSE,

    *Defendant*.

Civil Action No. 1: 21-cv-03159 (CJN)

## MEMORANDUM OPINION

Plaintiff Brett T. Herrington is a former United States Army Ranger who medically separated from service in 2005 due to a back injury sustained during a training exercise. His separation came with a disability rating of 10%, which was too low to receive certain retirement benefits. Following an internal appeal, the Department of Defense raised his disability rating but only to 20%, still lower than the 30% threshold that would entitle him to those benefits. In this suit, Herrington argues that the government erred in assigning him the lower disability rating. For the reasons that follow, the Court disagrees, and therefore grants the government's summary judgment motion, ECF 17, and denies Herrington's, ECF 18.

### I.  Background

**A.  Herrington's Injury**

Herrington enlisted in the United States Army on January 9, 2002. ECF 23-1 at 45. For three years, he served as a Chemical Operations Specialist in the 75th Ranger Regimen—deploying to both Iraq and Afghanistan to support large-scale operations missions. *Id.* For his service in these theaters, he received several medals and citations including the Army Commendation Medal, the Global War on Terrorism Service Medal, and the Global War on Terror Expeditionary Medal. *Id.*

1

On August 3, 2003, following his first deployment, Herrington injured his back during a parachuting exercise. *Id.* at 11. Although his pain was "acute, chronic, and severe," he nevertheless deployed to Afghanistan in support of Operation Winter Strike, from September 19, 2003, to December 12, 2003. ECF 18-1 at 10; ECF 23-1 at 31. But Herrington's back pain did not subside. Indeed, immediately after he returned from combat, a medical visit revealed fractured vertebrae. As a result, Herrington was instructed to avoid sitting or standing for more than 10 minutes at a time, not to lift anything heavier than 20 pounds, and to refrain from "crawling, rucksack, or roadmarch." ECF 23-1 at 125.

On February 19, 2004, Herrington saw an orthopedic specialist, who noted that Herrington suffered from "low back pain and right L2, 3, or 4 radiculopathy" with "[t]ransient loss of feeling/movement in legs . . . [with] persistent [low back pain] and episodic leg numbness." *Id*. at 123. A follow-up MRI five days later revealed "[m]ultilevel mild degenerative changes most significant at L4-5 where there is focal protrusion or extrusion of disc material centrally that causes stenosis and compromises the thecal sac." ECF 23-1 at 47. And on March 4, 2004, an orthopedic evaluation revealed that Herrington's forward flexion range of motion was limited to 30 degrees "due to pain" and that the results of a straight leg test for his left leg were positive. *Id.* at 11, ECF 18-1 at 12.

Notwithstanding his continued pain and these diagnoses, Herrington redeployed to Afghanistan the very next day, where he served for another ten weeks. *Id.* at 31. But his back pain persisted, and upon his return, his treating physician noted that his pain was "worse [with] prolonged position sitting or standing" and "pain did go into [left lower extremity]." ECF 18-1 at 12. The same physician noted that Herrington would likely need to go through the disability evaluation and separation process. *Id.* Almost two months later, Herrington was prescribed physical therapy and facet injections. The treating physician denoted a "HNP" ("herneation of nucleus pulposus") of

2

Herrington's L4-5 nerves and marked "lumbar radiculopathy" on his "order list." ECF 23-1 at 32, 51, 64.

### B.     Herrington's Separation Process

By September 2004, it was becoming clear that Herrington was not physically capable of continued service and would likely need to be medically separated from the Army. ECF 18-1 at 13. Chapter 61 of Title 10 of the United States Code establishes a two-step process for the discharge of military personnel who are unfit for continued military service due to disability. *See* 10 U.S.C. §§ 1201-1222. First, a Medical Evaluation Board (MEB) analyzes the relevant medical records and issues a report determining whether the servicemember has a disability that warrants review by a second board: The Physical Examination Board (PEB). *See generally* Army Reguls. 635-40 chs. 4-1–5-27. Second, if warranted, the PEB reviews the MEB's findings and, if it agrees that the servicemember is disabled, applies the "Veterans Affairs Schedule for Rating Disabilities" (VASRD) as it existed at the time or medical severance to assign the disability a rating from 0% to 100%. *See* Army Reguls. 635-40 ch. 4-22. To do so, the PEB rates each individual disability and then combines those ratings.

In the event that the final combined rating is lower than 30%, the servicemember is medically separated from service with a one-time lump-sum service payment, but no additional retirement benefits. But if the final combined rating is greater than or equal to 30%, the servicemember is entitled to retirement benefits, including military healthcare for the retiree, the retiree's spouse, and the retiree's minor children, as well as access to military bases and commissary privileges. 10 U.S.C. §§ 1212, 1401.

In connection with that process, on September 24, 2004, Herrington was given a physical therapy range of motion examination that measured his forward flexion at 45 degrees with a four-out-of-ten pain rating—an improvement from the 30-degree range reflected in his examination six

months earlier.  ECF 23-1 at 12.  Three days later, Herrington received a formal MEB examination.  ECF 17-1 at 9.  During that examination, Herrington reported that he was experiencing "[r]ecurrent back pain" along with "numbness or tingling."  ECF 23-1 at 35.  A variety of range of motion tests—forward flexation, extension, left lateral flexation, right lateral flexation, left lateral rotation, and right lateral rotation—showed "moderate decreased" range of motion.  *Id.* at 12.  This September 27 report made no mention of radiculopathy.  On September 29, 2004, Herrington's commanding officer submitted to the MEB his views regarding Herrington's physical capacity to undertake military activities.  *Id.* at 49.  According to Herrington's CO, "[t]he most basic physical training events, push-ups, sit-ups and running all cause [Herrington] sufficient pain to preclude them from his everyday activities"; the CO also stated that "[t]here is no unit in the Army that I would assign SPC Herrington to, he is not capable of performing even very light duty without significant pain."  *Id.*

On January 21, 2005, the MEB issued its "narrative summary," which concluded that, while Herrington complained of daily pain, his physical examination showed no tenderness and that various core attributes of his upper and lower extremities were within normal limits.  ECF 23-1 at 54.  The MEB reached this conclusion based on the September 27, 2004 evaluation; the MEB did not appear to consider Herrington's prior evaluations and reports.  ECF 23-1 at 53 ("This narrative summary is based upon a physical examination performed by the attending physician on 27 September 2004").  The report did note that Herrington had "diffusely decreased range of motion with forward flexion of 45 degrees," and found him unable to do most "basic soldiering activities."  *Id.* at 55.  But the MEB's ultimate conclusion was that Herrington suffered from "[c]hronic uncomplicated non-radicular low back pain."  *Id.* at 39.  On February 7, 2005, Herrington signed that MEB report, indicating his certification "that this medical board accurately covers all of [his] medical conditions, that all health records pertaining to [his] case have been turned over to proper authorities, and that [he had] been counselled in accordance with C-6, Army Regulation 635-40."  *Id.* at 40.

4

Because the MEB had concluded that Herrington's pain was at least substantial enough to justify separation, the next step in the process was PEB review, and on February 18, 2005, the PEB issued a one-page report concluding that Herrington was entitled to only a 10% disability rating under 38 C.F.R. § 4.71a (Diagnostic Codes ("DC") 5299-5242). In particular, the PEB stated:

> "CHRONIC SUBJECTIVE LOW BACK PAIN, WITHOUT NEUROLOGIC ABNORMALITY, WITHOUT TENDERNESS OR SPASM. THORACOLUMBAR RANGE OF MOTION LIMITED BY PAIN…. Based on a review of the objective medical evidence of record, the findings of the PEB are the Soldier's medical and physical impairment prevents reasonable performance of duties required by grade and military specialty."

ECF 23-1 at 72.

As a result, in April 2005, Herrington received an honorable discharge. But because his disability rating was only 10%, he received a one-time lump-sum payment, but not the retirement benefits to which he would be entitled at 30%. ECF 18-1 at 16.

**C.    Herrington's Internal Appeal**

Over a decade passed. In September 2017, relying on the Dignified Treatment of Wounded Warriors Act—which Congress passed specifically to permit servicemembers to challenge disability ratings of 20% or lower for separations between September 11, 2001, and December 31, 2009 (10 U.S.C. § 1554a(a))—Herrington lodged a challenge with the Physical Disability Board of Review (PDBR). Herrington raised a number of alleged defects in the MEB's reasoning that the PEB had relied upon. He argued that the MEB (and, by acquiescence, the PEB) improperly failed to consider the February 24, 2004 MRI that indicated degenerative changes, the July 28, 2004 consultation in which the physician had denoted an "HNP" (herneation of nucleus pulposus) of L4-5 nerves (ECF 23-1 at 51), and his CO's observations. ECF 23-1 at 33. Herrington also disputed the MEB's characterization of his back pain as "slight/intermittent" and his prognosis as "good" despite his assertions that substantial pain had persisted despite physical therapy and facet injections. *Id.* at 34.

Herrington also attacked the PEB directly, arguing that it considered the wrong metric for forward flexion of his thoracolumbar spine—relying on his *standard* forward flexion (which was 45 degrees) instead of his forward flexion as limited by "functional loss due to pain (which was only 30 degrees)." *Id.* Citing 38 C.F.R. §4.40's admonishment that "[i]t is essential that the examination on which [disability] ratings are based adequately portray the anatomical damage[] and the functional loss"—as well as *DeLuca v. Brown*, a decision from the U.S. Court of Veterans Appeals that vacated a Board of Veterans' Appeals disability rating failing to reflect these nuances—Herrington argued that the PEB was required to premise its decision on forward flexation as limited by functional loss. *Id.* That flexation number of 30 degrees, he noted, merited a disability rating of 40% under 38 C.F.R. §§ 4.71. *Id.* Finally, Herrington contended that the MEB and PEB should have given a separate rating of 10% to each of his legs due to the alleged "lower extremity radiculopathy" in each. *Id.* at 35. He cited, as evidence, the February 19 MRI report's observation of "episodic leg numbness" as well as his CO's account. *Id.* at 35, 67. Although he conceded that "there is no diagnostic code for lower extremity radiculopathy" in the VASRD that connects that disability with a specific pain rating, Herrington pointed the PDBR to 38 C.F.R. § 4.20, which makes it "permissible to rate [an unlisted condition] under a closely-related condition in which the functions affected, anatomical localization, and symptomatology are closely analogous." *Id.* at 35.

The PDBR agreed with Herrington that the PEB's disability rating of 10% was too low. But it only boosted the number to 20%—obviously still lower than 30%. *Id.* at 12. Unlike the MEB or PEB, the PDBR did consider materials beyond the September 2004 reports. It stated that "[i]n February 2004 an orthopedic examiner noted evidence of a small anterior compression fracture of L2 and suspected an adjacent disk injury and protrusion"—presumably a reference to the February 19 consultation. *Id.* at 11. The PDBR also referenced the February 24, 2004 MRI, noting that it "showed multilevel degenerative disc disease, most significant at L4-5 where there was extrusion of

disc material centrally that caused stenosis and compromised the thecal sac." *Id.* And it acknowledged the 30-degree forward flexion noted in the March 4 report. *Id.* The remainder of the PDBR's decision was based on the September 2004 materials. The PDBR "considered the somewhat disparate [range of motion] evaluations" between the March 4 report and the September report (increasing from 30 degrees to 45 degrees) "and assigned higher probative value to the [September report] because it was more complete and closer to separation." *Id.* at 12. The PDBR also noted that "radiculopathy was neither profiled nor implicated in" Herrington's materials and thus "concluded that radiculopathy, despite being contended, was not in the scope of review." *Id.*

On July 15, 2020, the Deputy Assistant Secretary of the Army accepted the PDBR's recommendation to rate SPC Herrington's disability at 20%. ECF 18-1 at 20. Herrington thereafter filed this suit, contending that the PDBR's decision was arbitrary and capricious under the Administrative Procedure Act.

## II.     Analysis

### A.     Standard of Review

Summary judgment is appropriate, of course, only when the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 327, 322 (1986). "Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. By Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). In resolving such questions, "the reviewing court must consider whether the agency's decision was based on consideration of relevant factors and whether there was a clear error of judgment." *Escobedo v. Green*, 602 F. Supp. 2d 244, 248 (D.D.C. 2009).

During the initial round of briefing on the cross-motions for summary judgment, the parties

disagreed whether in this case "an unusually deferential application of the arbitrary or capricious standard of the APA" (as the government put it) applies because Herrington challenges a military decision.  In the interim, however, the Court of Appeals decided that the "default [APA] standard of review" (and not a more deferential one) applies to challenges to PDBR decisions.  *See Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023).  But as the Court of Appeals also noted, "even ordinary arbitrary-and-capricious review is '[h]ighly deferential' and 'presumes the validity of agency action.'"  *Id.* (*quoting AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000)).

B.   **The PDBR's Decision Was Not Arbitrary and Capricious**

The PEB and PDBR perform a somewhat strange task:  they assign specific numeric ratings to physical and mental disabilities.  That process necessarily requires some judgment, which here is vested in the Secretary of Defense as an application of the "standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination"—that is, to the VASRD as it read in 2005 when Herrington was medically separated.  *Id.* at § 1203(b)(4).  At a minimum, however, the Secretary (acting through the PDBR) "must have considered relevant data and articulated an explanation establishing a rational connection between the facts found and the choice made."  *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986); see also *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993).

The Court concludes that the PDBR did so here.  Herrington's primary argument is that the PDBR, like the PEB and MEB before it, relied too heavily on the September 2004 materials and did not sufficiently consider the other medical records before it.  But the PDBR provided an explanation for why it relied so heavily on these materials, stating that it "assigned higher probative rating value to the [September 24, 2004] PT ROM [Physical Therapy Range of Motion] study because it was more complete and closer [in time] to separation."  ECF 23-1 at 12.  The Court cannot say that the PDRB acted arbitrarily and capriciously in relying on the September 2004 materials for these two

8

reasons. After all, those materials were closest in time to Herrington's separation, which is surely a relevant consideration. And the September 2004 examination was also more complete than any other examination, testing his range of motion for right rotation, left rotation, side flection, and standing flexation—along with the pain experienced during each test. *Id.* at 32. The March 4 examination, as best the Court can tell, only tested forward flexation; earlier examinations performed no such tests at all. *Id.*

Herrington raises other specific arguments. He contends that the PDRB was required to credit his forward flexion *as limited by pain*, but the PDRB did consider the fact that "[p]ainful motion was present" during the forward flexion test that yielded a 45-degree measurement. *Id.* at 12. The PDRB did not act arbitrarily and capriciously in relying on one pain-limited flexation test rather than another. Nor was it arbitrary and capricious for the PDBR to conclude that the 45-degree flexation metric, which included the presence of pain, "adequately portray[ed]" the relevant functional loss. 38 C.F.R. § 4.59.

Herrington also argues that the PDBR erred in concluding that his argument that he suffered from radiculopathy was not within its scope of review. Although Herrington relies heavily on this condition now, it is hardly mentioned in the record at all: as a "[n]ote" made by the orthopedist following the February 13, 2004 MRI, *id.* at 123, and again in the third of eight entries on Herrington's "Patient order List" from the July 28, 2004 consultation/prescription. *Id.* at 64. The February 24 and March 4 consultations do not appear to mention this condition. More important, the PDBR is not required to review conditions not credited by the PEB. Instead, the Board "may, at the request of an eligible member… review conditions *identified but not determined to be unfitting* by the PEB." DoDI 6040.44, encl. 3, para. 1.b (emphasis added). Here, the PEB did not identify radiculopathy, much less treat it as not "unfitting"; the PDRB did not, therefore, err in "conclud[ing] that radiculopathy, despite being contended, was not in the scope of review." ECF 23-1 at 12.

9

### III. Conclusion

For the foregoing reasons, the Government's Motion for Summary Judgment, ECF 17, is GRANTED and Plaintiff's Cross Motion for Summary Judgment, ECF 178, is DENIED. A separate order will accompany this opinion.

DATE: March 31, 2025

CARL J. NICHOLS
United States District Judge